UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No.  6:07-cr-97-Orl-18DAB

LOUIS J. PEARLMAN

**PLEA AGREEMENT**

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Robert E.

O'Neill, United States Attorney for the Middle District of Florida, and the defendant,

LOUIS J. PEARLMAN, and the attorneys for the defendant, R. Fletcher Peacock,

Donald R. West, and Stephen J. Langs, mutually agree as follows:

A.      **Particularized Terms**

1.      Counts Pleading To

The defendant shall enter a plea of guilty to Counts One, Two, Three, and

Four of the First Superseding Information.  Counts One and Two charge the defendant

with conspiracy to commit an offense against the United States, in violation of 18 U.S.C.

§ 371.  Count Three charges the defendant with money laundering, in violation of 18

U.S.C. § 1957.  Count Four charges the defendant with presenting or using a false

claim in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(4).

2.      Maximum Penalties

Counts One, Two, and Four each carry a maximum sentence of five years

imprisonment, a fine of $250,000, a term of supervised release of not more than three

years, and a special assessment of $100 per felony count, said special assessment to

Defendant's Initials _____

AF Approval _____
Chief Approval _____

be due on the date of sentencing.  Count Three carries a maximum sentence of ten

years imprisonment, a fine of $250,000, a term of supervised release of not more than

three years, and a special assessment of $100 per felony count, said special

assessment to be due on the date of sentencing.  With respect to the maximum fine, the

Court may impose an alternative fine of not more than twice the amount of the criminally

derived property involved in the transaction pursuant to 18 U.S.C. § 1957(b)(2) or, if any

person derives pecuniary gain from the offense, or if the offense results in pecuniary

loss to a person other than the defendant, the defendant may be fined, pursuant to 18

U.S.C. § 3571(d), to not more than twice the gross gain or twice the gross loss, unless

imposition of such a fine would unduly complicate or prolong the sentencing process.

With respect to certain offenses, the Court shall order the defendant to make restitution

to any victim of the offense(s), and with respect to other offenses, the Court may order

the defendant to make restitution to any victim of the offense(s), or to the community, as

set forth below.

     3.    <u>Elements of the Offense(s)</u>

The defendant acknowledges understanding the nature and elements of

the offense(s) with which defendant has been charged and to which defendant is

pleading guilty.  The elements of Count One and Two are:

<u>First</u>:    That two or more persons, in some way or manner, came to
a mutual understanding to try to accomplish a common and
unlawful plan, as charged in the indictment;

<u>Second</u>:    That the Defendant, knowing the unlawful purpose of the
plan, willfully joined in it;

Defendant's Initials         2        Chief Approval

<u>Third</u>:      That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the methods (or "overt acts") described in the indictment; and

<u>Fourth</u>:     That such "overt act" was knowingly committed at or about the time alleged in an effort to carry out or accomplish some object of the conspiracy.

The elements of Count Three are:

<u>First</u>:      That the Defendant knowingly engaged or attempted to engage in a monetary transaction;

<u>Second</u>:    That the Defendant knew the transaction involved criminally derived property;

<u>Third</u>:      That the property had a value of greater than $10,000;

<u>Fourth</u>:     That the property was, in fact, derived from mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343; and

<u>Fifth</u>:      That the transaction occurred in the United States or otherwise as set forth in 18 U.S.C. § 1957(d).

The elements of Count Four are:

<u>First</u>:      That on or about the date charged, there was pending in the United States Bankruptcy Court for the Middle District of Florida, a bankruptcy case docketed as Case Number 6:07-bk-1505-ABB, wherein, Louis J. Pearlman Enterprises, Inc. was the Debtor;

<u>Second</u>:    That the Defendant in a personal capacity or as or through an agent, proxy, or attorney presented or used a claim against the estate of the Debtor in such bankruptcy proceeding;

<u>Third</u>:      That the claim so presented or used was false as to a material fact; and

<u>Fourth</u>:     That the Defendant presented or used such claim knowingly and fraudulently.

Defendant's Initials          3         Chief Approval _TKH_

4.      Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.      Original Indictment Dismissed

At the time of sentencing, the original indictment against the defendant will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

6.      No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

7.      Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. §§ 3663A(a) and (b), defendant agrees to make full restitution to each and every victim who has been directly and proximately harmed as a result of the commission of the offenses to which the defendant is pleading guilty, including, but not limited to, each and every victim who purchased stock in Transcontinental Airlines Travel Services, Inc., each and every victim who invested money in an Employee Investment Savings Account, and each and every federally insured financial institution (including, but not limited to, Integra Bank N.A., Bank of America, American Bank of St. Paul, First International Bank & Trust, MB Financial Bank NA, Northside Community Bank, Mercantile, Washington Mutual, First National

Defendant's Initials _____        4        Chief Approval _____

Bank & Trust, and HSBC Bank) that loaned money or provided a line of credit to the defendant or one of his entities.

      8.    <u>Incarceration Recommendation</u>

      The defendant acknowledges that the United States will recommend to the Court that the defendant be sentenced to a substantial period of incarceration.

      9.    <u>Guidelines Sentence</u>

      Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement.  The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

      10.    <u>Acceptance of Responsibility - Three Levels</u>

      At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

      Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the

Defendant's Initials _____             5             Chief Approval _____

provisions of USSG §3E1.1(b), the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level.  The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

    11.   <u>Cooperation - Substantial Assistance to be Considered</u>

        Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such

Defendant's Initials _____           6           Chief Approval _____

cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      12.    <u>Use of Information - Section 1B1.8</u>

      Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

      13.    <u>Cooperation - Responsibilities of Parties</u>

      a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

      b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this

Defendant's Initials _____           7           Chief Approval _____

agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)     The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)     The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the

Defendant's Initials _____     8     Chief Approval _____

defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

14.     Cooperation – Identification of Assets

In addition to providing cooperation as outlined in paragraphs 11, 12, and 13 of Part A above, the defendant agrees to cooperate fully with the United States in the identification of any assets that may be subject to forfeiture or that may be property belonging to a bankruptcy estate.  As part of this agreement to cooperate, the defendant agrees to provide a full and complete disclosure of all relevant information related to the location of any assets that may be forfeited or that may belong to a bankruptcy estate,

Defendant's Initials _____          9          Chief Approval _____

including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require, including interviews with the bankruptcy trustee. The defendant further agrees to take any and all steps necessary to transfer any assets that are identified to the United States, the bankruptcy trustee, or the person or entity to which the United States directs the defendant to transfer the asset. It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information about the location of assets may be subject to forfeiture or that may be property belonging to a bankruptcy estate, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted in this paragraph, the five conditions set forth in paragraph 13b of Part A shall apply.

      15.   <u>Forfeiture of Assets</u>

      The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture pursuant to 18 U.S.C. §§ 981, 982 and 28 U.S.C. § 2461, whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the following: a $200,000,000.00 money judgment; the administrative forfeiture of the following assets: 2004 Cadillac Escalade, 2005 Chrysler 300, Check from Bank of America ($71,935.33), Check from Wachovia Bank ($25,000.00), 2004 Rolls Royce Phantom, and a 2006 Cadillac Professional Limousine; and any assets discovered in the future to satisfy the $200,000,000.00 money judgment. The defendant agrees and

Defendant's Initials _____          10          Chief Approval _____

consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.  The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have that the forfeiture constitutes an excessive fine.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government.  Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the court make a determination that the government has established the requisite nexus between the property subject to forfeiture and the offense(s) to which defendant is pleading guilty and enter a preliminary order of forfeiture.  Pursuant to Rule 32.2(b)(3), the defendant agrees that the preliminary order of forfeiture shall be final as to the defendant at the time it is entered, notwithstanding the requirement that it be made a part of the sentence and be included in the judgment.

The defendant agrees to forfeit all interests in the properties described above and to take whatever steps are necessary to pass clear title to the United States.  These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Defendant further agrees to take all steps necessary to locate property and to pass title to the United States before the defendant's sentencing.  To that end, defendant agrees to fully assist the government in the recovery and return to the United

Defendant's Initials _____            11                Chief Approval _____

States of any assets, or portions thereof, as described above wherever located.  The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.

The defendant agrees that any property located will be applied toward the payment of the money judgment described above.  If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above.  This Court shall retain jurisdiction to settle any disputes arising from application of this clause.  The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

**B.**   **Standard Terms and Conditions**

1.   Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1) (limited to offenses committed on or after April 24, 1996); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663 (limited to offenses committed on or after November 1, 1987) or § 3579, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  On each count to which a plea of guilty is entered, the Court shall impose a special assessment, to be payable to the Clerk's Office, United States District Court, and due on date of sentencing.  The defendant understands that this agreement imposes no limitation as to fine.

2.   Supervised Release

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.   Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information,

Defendant's Initials _____          13          Chief Approval _____

including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit, upon execution of this plea agreement, an affidavit reflecting the defendant's financial condition.  The defendant further agrees, and by the execution of this plea agreement, authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office or any victim named in an order of restitution, or any other source, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.

4.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges

Defendant's Initials _____        14        Chief Approval _____

that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

     5.     Defendant's Waiver of Right to Appeal and
               Right to Collaterally Challenge the Sentence

        The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence or to challenge it collaterally on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by Title 18, United States Code, Section 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by Title 18, United States Code, Section 3742(a).

Defendant's Initials _____       15       Chief Approval _____

6.      Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

7.      Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

8.      Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and

Defendant's Initials _____          16          Chief Approval _____

the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

     9.     <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt:

<u>FACTS</u>

**A.    Introduction**

For over twenty years, LOUIS J. PEARLMAN was successful in raising millions of dollars based on false representations about two companies affiliated with him.  One of those companies was Transcontinental Airlines Travel Services, Inc.  The other was Transcontinental Airlines, Inc.  PEARLMAN represented to thousands of investors and several federally insured financial institutions that those two companies were successful

Defendant's Initials _____       17       Chief Approval _____

companies in the airline business and that PEARLMAN's ownership interest in those companies was worth millions of dollars.  That was not true.  To the contrary, Transcontinental Airlines Travel Services, Inc. and Transcontinental Airlines, Inc. existed only on paper.  Those companies had minimal employees, business operations, and revenue.

This case involves three conspiracies and schemes to defraud perpetrated by PEARLMAN and others: (1) a "Ponzi" scheme based on fraudulent investments offered in connection with Transcontinental Airlines Travel Services, Inc. and Transcontinental Airlines, Inc., (2) a bank fraud scheme involving misrepresentations about the financial condition of PEARLMAN and his companies, and (3) a bankruptcy fraud scheme.  The amount of loss for these three schemes is currently estimated at over $300 million.

**B.** **Overview of "Ponzi" Scheme**

The first scheme involved the use of two PEARLMAN-controlled companies as means to raise money from investors in a "Ponzi" scheme.  One company was Transcontinental Airlines Travel Services, Inc.  The other was Transcontinental Airlines, Inc.  PEARLMAN and his conspirators raised money from investors by selling stock in Transcontinental Airlines Travel Service, Inc. and by promising higher than market rate of returns for investments placed in something called an Employee Investment Savings Account.  Neither of those investments were legitimate.  Instead, they were "Ponzi" schemes by which money raised from later investors would be used to pay off earlier investors.

Defendant's Initials            18          Chief Approval _____

**(1)**    **Transcontinental Airlines Travel Services, Inc.**

Transcontinental Airlines Travel Services, Inc. was incorporated in Delaware in 1981. In the 1980s, PEARLMAN and others began to sell stock in that corporation. Shares were sold for $10 each with the representation that interest or dividends would be paid out at ten percent a year. Sales continued into the 2000s. Potential purchasers of the stock were told by PEARLMAN and others that Transcontinental Airlines Travel Services, Inc. was a Delaware corporation with significant assets. In fact, the corporation has no tangible assets, and it ceased to exist even on paper in March 1999 when it became void in Delaware. Despite those facts, PEARLMAN and others continued to sell stock in Transcontinental Airlines Travel Services, Inc. after March 1999, and investors were sent quarterly statements by United States mail from Orange County in the Middle District of Florida that falsely represented that their stock investments were making 10 percent a year in interest. To lull those investors into believing that their investments were going to yield high rates of return, PEARLMAN falsely represented on several occasions that Transcontinental Airlines Travel Services, Inc. was going public and that the value of the stock of that company was going to increase, when, as PEARLMAN knew, that was not true.

To date, investigators have discovered more than 200 individuals who purchased stock of Transcontinental Airlines Travel Services, Inc. The total amount expended on those purchases is in the millions of dollars.

Defendant's Initials _____          19          Chief Approval _____

**(2)     Transcontinental Airlines, Inc.**

In addition to selling worthless stock, PEARLMAN engaged in another investment scheme with one of his corporations.  From at least 1989 through January 2007, Transcontinental Airlines, Inc. ("Trans Con Airlines") offered Florida and non-Florida residents the opportunity to invest funds in what it called an Employee Investment Savings Account ("EISA").  Contrary to what its name suggested, the EISA program was not limited to employees of Trans Con Airlines, and, with few exceptions, EISA investors were not employees or family members of Trans Con Airlines employees.

To induce individuals to invest in the EISA program, the following are some, but not all, of the misrepresentations that were made:

      a.    The investments were insured by the Federal Deposit Insurance Corporation ("FDIC").

      b.    The investments were re-insured by either Lloyd's of London or AIG Insurance Company.

      c.    The investments would be held in individual bank accounts with unique account numbers.

      d.    Trans Con Airlines was a successful company with millions in revenue.

      e.    The EISA program provided higher than market rate of returns because Trans Con Airlines was passing on the higher rates of return that banks gave it as a large and successful company.

As PEARLMAN and his conspirators knew, none of these representations were true.



C.   **Overview of Bank Fraud Scheme**

Since at least 2002, PEARLMAN and conspirators have engaged in a scheme to defraud federally insured financial institutions by means of false representations.  The types of misrepresentations that were made included the following:

1.   PEARLMAN caused false financial statements purportedly prepared by a fictitious accounting firm called Cohen & Siegel to be provided to federally insured financial institutions.  Those financial statements overstated the assets and income of Trans Con Airlines.

2.   PEARLMAN caused false tax returns by a fictitious accounting firm called Cohen & Siegel to be provided to federally insured financial institutions.  Those financial statements overstated the assets and income of Trans Con Airlines and himself personally.

3.   PEARLMAN misrepresented that a shareholder in Trans Con Airlines, Theodore Wullenkamper, had $50 million in a trust that was available to PEARLMAN for business uses.

4.   PEARLMAN misrepresented the value of the collateral that secured loans and double-pledged stock.

5.   PEARLMAN falsely represented that wire transfers from a financial institution known as either "German Investment Und Finanzberatung GmbH" or "German Savings Bank" were being held by the United States Department of Homeland Security when, in truth and in fact, the United States Department of Homeland Security had not stopped any such wire transfer.

As PEARLMAN and his conspirators knew, none of these representations were true.  Despite that knowledge, PEARLMAN made these misrepresentations to get money from the federally insured financial institutions.  PEARLMAN did that because he had tremendous demands for cash from EISA investors and prior loans made by federally insured financial institutions.  In sum, PEARLMAN ran his bank fraud scheme as another Ponzi scheme where he would use the financing that he obtained to make

Defendant's Initials _____          21          Chief Approval _____

payments on other bank loans or to investors who were victims of his other Ponzi scheme, or he would take that money for his own personal use or the personal use of his conspirators.

**D.    Misrepresentations**

Over the course of twenty years, PEARLMAN and his conspirators have made a number of misrepresentations in connection with the execution of the Ponzi and bank fraud schemes described above.  Because Trans Con Airlines was used in connection with both schemes, some misrepresentations were used in the execution of both schemes.  Others were used in one scheme, but not the other.  The following will address some, but not all, of the misrepresentations that were made by PEARLMAN and his conspirators.  The misrepresentations are divided into those that were made as part of the execution of both schemes, those that were made in connection with the Ponzi scheme, and those that were made in connection with the bank fraud scheme.

**(1)    Misrepresentations Made in Both Schemes**

**(a)    Cohen & Siegel**

A mainstay in both PEARLMAN's Ponzi scheme and bank fraud scheme is the use of documents from a fictitious accounting firm called "Cohen & Siegel." PEARLMAN has used documents from Cohen & Siegel since the mid-1990s.  With respect to the Ponzi scheme, PEARLMAN caused some sales agents to be provided with a copy of a Cohen & Siegel letter dated May 3, 1995.  The purpose of this letter was to assure prospective investors that an investment in the EISA program was safe, secure, and insured by both the FDIC and Lloyd's of London.  The letter purported to be

Defendant's Initials _____          22          Chief Approval _____

addressed to Louis Pearlman, President of Trans Con Airlines, from Cohen & Siegel,

and it provided in part:

> With reference to your Employee Investment Savings Account (E.I.S.A)
> program, we hereby are responding to your request as to our opinion:
>
> We certify this program meets all....Internal Revenue Service
> requirements and is available to all employees and shareholders of Trans
> Continental.  The reference literature fully depicts the plan and its
> deferment policy as well as insurance coverage by F.D.I.C. and Lloyds of
> London as maintained on file in your office...

Some prospective investors in the EISA program were provided with audited

financial statements of Trans Con Airlines that were purported to have been prepared

by Cohen & Siegel.  Others were provided with a copy of a Dun & Bradstreet report that

reflected financial information that had been taken from audited financial statements of

Trans Con Airlines that were purported to have been prepared by Cohen & Siegel.

PEARLMAN's use of Cohen & Siegel was more extensive in connection with the

bank fraud scheme.  PEARLMAN and other conspirators represented that Cohen &

Siegel was an accounting firm with offices in Germany and Florida, that the firm (or at

least one of its members) was licensed as a certified public accountant with the State of

Florida, and that the firm had been the longtime accounting firm for Trans Con Airlines.

To induce federally insured financial institutions to make loans to PEARLMAN and

entities controlled by him, PEARLMAN provided federally insured financial institutions

with documents that purported to be audited financial statements and tax returns for

Trans Con Airlines that had been prepared by Cohen & Siegel as well as tax returns for

PEARLMAN that purported to have been prepared by one of the partners of Cohen &

Siegel, Stanley Kaplan.  These financial documents falsely represented that Trans Con

Defendant's Initials             23            Chief Approval

Airlines had over $100 million in revenue and that Trans Con Airlines and PEARLMAN were financially well-off.

In fact, as PEARLMAN has always known, Cohen & Siegel is not a real accounting firm.  It has no office and no employees.  The accountants who have been alleged to work there do not exist.  Cohen & Siegel is fictitious in every respect.

Far from being an accounting firm with offices in Germany and Florida, Cohen & Siegel started as an answering serving in Coral Gables, Florida.  In 1995, a secretarial service called Coral Gables Secretarial started providing services for what it was told was an entity called, "Cohen & Siegel."  An associate of PEARLMAN told the owner of Coral Gables Secretarial that he wanted to set up a dedicated line and to have Coral Gables Secretarial answer the phone as "Good morning/afternoon Cohen and Siegel" and that "most of the calls will be for Stanley Cohen."  That associate of PEARLMAN told the owner of Coral Gables Secretarial that "Mr. Pearlman may also receive some calls" and instructed the owner of Coral Gables Secretarial to say "that Mr. Cohen/Pearlman/Siegel is out of the office in a meeting" and to take a complete message including name, area code and telephone number.

Coral Gables Secretarial billed PEARLMAN for services provided for Cohen & Siegel.  The owner of Coral Gables Secretarial would call a telephone number that belonged to PEARLMAN when Coral Gables Secretarial received messages for Cohen & Siegel.  During the over ten years that Coral Gables Secretarial provided these answering services for Cohen & Siegel, the owner of Coral Gables Secretarial never met or spoke with anyone who stated that they were with the Cohen & Siegel accounting firm.

Defendant's Initials _____   24   Chief Approval _____

The reason is that Cohen & Siegel does not exist.  On the tax returns that were purportedly prepared by the firm for Trans Con Airlines and by or one of the partners of the firm for PEARLMAN, an employer identification number was provided.  That employer identification number, however, had not been issued to Cohen & Siegel or the individual identified on the tax return.

Similarly, checks with the Florida Department of Business and Professional Regulation failed to provide any certified public accountant license for Cohen & Siegel.  There is a listing for a certified public accountant with the name of  "Stanley Cohen," but the licensing information indicates that he is no longer in active status and that his address is in Tallahassee, Florida.  Investigation has confirmed that the "Stanley Cohen" from Tallahassee, Florida did not work for Cohen & Siegel in Coral Gables, Florida.

Instead, the only evidence as to the existence of Cohen & Siegel was created by PEARLMAN or one of his conspirators.  For example, a handwritten draft of a letter for an accountant with the name of "Stanley Kaplan" was found during the execution of the search warrant of the offices of the companies collectively known as the "Trans Continental Companies," 124 West Pine Street, Orlando Florida 32801.  In the draft of the letter that was found, Kaplan is identified as a "Managing Partner."  The letter states in part:

> At Mr. Louis J. Pearlman's request, we hereby confirm the following as accountants for him as follows[.]

The handwritten draft letter is addressed to an individual, and it is dated November 6, 2006.  The letter was found in the office belonging to one of PEARLMAN's secretaries.

Defendant's Initials _____        25        Chief Approval _____

That individual has been interviewed about the letter, and she confirmed that PEARLMAN provided it to her to type and that the handwriting on the letter is PEARLMAN's handwriting.  A review of documents on the computer system revealed another document from the 1990s that was for "Stanley Kaplan" to sign.

There is other evidence that confirms that Cohen & Siegel is fictitious.  For example, Cohen & Siegel had a website at www.cohensiegel.com.  According to that website, Cohen & Siegel is an independent partnership with an office located in downtown Coral Gables, Florida with headquarters outside Frankfurt, Germany.  The website represented that the firm was licensed to practice as certified public accountants in the states of New York and Florida.   The German address listed for the firm is Gewerbering 5, DG Raum Links, 47623 Kevelaer, which is the same address as German Savings (another entity used by PEARLMAN and others during the executions of their schemes).  After PEARLMAN left the United States in January 2007, the website was taken down and has never been put back up.

While the website was working, the following two German addresses were provided on the www.cohensiegel.com website:

Mainz: Industriestr. 16 - 55116 Mainz

Frankfort: Lyoner Strausse 26-60258 Franfort

A person who visited the Frankfort address on or about February 1, 2007 found no indication that Cohen & Siegel had an office in the building or that it ever had an office in the building.  That person also visited the other address in Mainz and determined it was an apartment building.  Two investigators for federally insured financial institutions have also attempted to locate the offices for Cohen & Siegel in Germany or to

Defendant's Initials _____          26          Chief Approval _____

determine whether the accounting firm exists.  Neither of them found any evidence as to the existence of Cohen & Siegel.  The only times that anyone has ever met anyone who purportedly worked for Cohen & Siegel were on a couple of occasions when fake offices were set up in Germany as part of an effort to make it appear that Cohen & Siegel existed when it did not.

### (b)   German Savings Bank

Cohen & Siegel was not the only entity used by PEARLMAN and his conspirators that was not what it purported to be.  Another such entity is "German Investment Und Finanzberatung GmbH" or "German Savings Bank", which was claimed to be a German domiciled entity.

PEARLMAN used German Savings Bank in a similar manner in the Ponzi scheme and bank fraud scheme.  Whenever PEARLMAN was unable to keep up with his various financial obligations, PEARLMAN would use German Savings Bank as an excuse as to why he could not get money to investors or federally insured financial institutions that was due to be paid.

With respect to the Ponzi scheme, PEARLMAN attempted to use German Savings Bank to hold off an investigation by the State of Florida Office of Financial Regulation ("OFR").  In the course of the OFR's attempt to locate EISA funds, PEARLMAN caused the OFR to be provided in December 2006 with a two page account summary that represented that approximately $39.5 million of EISA investor funds were located in German Savings Bank.

As for the bank fraud scheme, PEARLMAN claimed that he had significant deposits in German Savings Bank.  On several different occasions in 2006, PEARLMAN

Defendant's Initials _____       27       Chief Approval _____

claimed that money from German Savings Bank was being wire transferred to pay amounts that PEARLMAN owed on loans in the United States.  The money never made it.  In an effort to explain why the money had not been transferred, PEARLMAN falsely represented, among other things, that the money had been held up by the United States Department of Homeland Security or that there had been an error made in the wire transfer instructions.

In fact, as PEARLMAN knew, he had no money in German Savings Bank, and that entity was not what it was represented to be.  The only address that has been provided for German Savings Bank is the same address that was provided as one of the German addresses listed  for Cohen & Siegel on its website.  No one has been able to find an office for German Saving Bank at that location or any other.

One of the items that was found in PEARLMAN's briefcase when he was deported from Indonesia were documents related to German Savings Bank.  Those documents show that PEARLMAN, while abroad, was creating a seal and other documents to make German Savings Bank seem legitimate.  In addition, a search warrant was executed on e-mail accounts used by PEARLMAN after he left the United States in January 2007.  Several of those e-mails show that it was PEARLMAN who was directing other conspirators in how to make German Savings Bank appear to be legitimate and how those conspirators should prepare false documents that purported to be from German Savings Bank to be filed in bankruptcy proceedings pending in the Middle District of Florida.  In addition, a review of the bank accounts for PEARLMAN and various of his entities fails to disclose any assets being transferred to German

Defendant's Initials _____      28      Chief Approval _____

Savings Bank or any documentation that would confirm that German Savings Bank is a functioning financial institution.

### (c)    Harry Milner

To create the illusion that Trans Con Airlines was a legitimate company, PEARLMAN and his conspirators would use the names and identities of other individuals as officers and directors of that company. One that was prominently used was that of Harry Milner.

According to documents filed with the Florida Secretary of State, Harry Milner was an officer of Trans Con Airlines in the late 1970s. Over the past twenty years, investors in the EISA program received correspondence from Harry Milner. For example, on December 15, 2006, a letter was sent to each EISA investor by United States Mail from Orange County in the Middle District of Florida that purported to provide an update on the EISA program.

Similarly, Harry Milner was a name that was used on several documents that were submitted in connection with bank loans. Corporate documents from Trans Con Airlines were provided in which Harry Milner authorized certain actions to be taken by the company. In addition, federal tax returns were provided to federally insured financial institutions that were purportedly signed by Harry Milner, including returns that included signature dates of 2003 and afterwards.

As PEARLMAN knew, all of these representations as to the involvement of Harry Milner in Trans Con Airlines were false. Harry Milner was a real person, and Harry Milner did know PEARLMAN at some point and have some business relationship with him. Nevertheless, Harry Milner had nothing to do Trans Con Airlines from 1989 to

Defendant's Initials _____        29              Chief Approval _____

January 2007.  Moreover, Harry Milner died in December 2003, so that it was impossible for him to have signed anything after that date.

### (d)    Trans Con Airlines

A constant representation made by PEARLMAN during the execution of the Ponzi scheme and bank fraud scheme was that Trans Con Airlines was a legitimate company with over $100 million in annual revenue.  As PEARLMAN knew, that was not true.  Other than serving as the guarantor on several bank loans, Trans Con Airlines had no purpose.  It had no revenues, no airplanes, no employees, and no contracts with airlines.

Despite that knowledge, PEARLMAN caused documents to be provided to Dun & Bradstreet that caused that company to generate a report that represented that Trans Con Airlines was a legitimate company with millions of dollars in revenues.  Copies of that Dun & Bradstreet report were then provided to prospective EISA investors as part of an effort to induce them to invest.

### (2)    Additional Misrepresentations Regarding Ponzi Scheme

### (a)    FDIC Insurance

Since 1989, the EISA program has been marketed as being FDIC insured.  Early on, the quarterly statements that were sent by United States Mail from Orange County in the Middle District of Florida to EISA investors expressly stated on the second page of the statement that the investment was FDIC insured.  Brochures used as marketing materials for the EISA program represented that $100,000 of any investment was FDIC insured.  In addition, PEARLMAN caused materials to be provided to brokers and sales

Defendant's Initials  30    Chief Approval _____

agents that included similar representations to be disseminated to prospective

investors.  As noted above, PEARLMAN caused some sales agents to be provided with

a copy of a Cohen & Siegel letter dated May 3, 1995 that provided in part:

> With reference to your Employee Investment Savings Account (E.I.S.A)
> program, we hereby are responding to your request as to our opinion:
>
> We certify this program meets all....Internal Revenue Service
> requirements and is available to all employees and shareholders of Trans
> Continental.  The reference literature fully depicts the plan and its
> deferment policy as well as insurance coverage by F.D.I.C. and Lloyds of
> London as maintained on file in your office...

PEARLMAN also directly represented to investors that investments in the EISA

program were FDIC insured.  For example, one EISA investor received a letter dated

August 1, 1995 from PEARLMAN that represented:

> The Employee Investment Savings Account (E.I.S.A.) is available to all
> employees and shareholders of Trans Continental.  The reference
> literature depicts the plan as well as the insurance coverage by the
> F.D.I..C. and Lloyd's of London as maintained on file in our office...

The letter also contained a two page attachment.  Page one of the attachment was titled

"Lloyd's Policy"and appeared to be a cover page of an insurance policy.  Page two

reflects a policy number of 823/AM9100780 and that the "Assured" is Trans Continental

Airlines, Inc.

As PEARLMAN knew, the representations that he made about FDIC insurance

were false.  During the time that the EISA program was being marketed, PEARLMAN

was contacted by the FDIC.  One letter was sent to PEARLMAN on October 26, 2001 in

which PEARLMAN was questioned about the claim that EISA investments were FDIC

insured:

Defendant's Initials _____          31          Chief Approval _____

> I am writing you concerning about FDIC insurance of Employee Investment Savings Accounts at Trans Continental Airlines. . . .
>
> My concerns center around the use of the word "FDIC" and the confusing manner in which insurance on the Employee Investment Savings Account is discussed.

In response, PEARLMAN sent a letter to the FDIC in which he misrepresented the manner in which the EISA program was being marketed:

> Our company is Trans Continental Airlines, Inc. We do not offer to anyone other than employees or our private shareholders our Employee Investment Savings Account plan.
>
> Our employees have their own individual accounts set up with approved banking institutions. Our matching plan is based on years of service. We have not solicited anyone nor have accepted anyone to this plan that does not qualify and certainly not the general public...

PEARLMAN never stopped marketing the EISA program as being FDIC insured. To the contrary, that false claim was always a central focus of the marketing of the EISA program. As PEARLMAN knew, however, the money invested in the EISA program was not held in individually numbered accounts or certificates of deposits as was represented. Instead, the money was put into bank accounts that was used by PEARLMAN and others to pay their personal expenses and to continue the Ponzi scheme. As a result of the manner in which EISA investments were handled, the FDIC Office of Inspector General has confirmed that the EISA investor funds were not insured by the FDIC as related to investment losses. Had the EISA funds been placed in separate accounts in a FDIC insured bank, then the funds in the account would have been insured up to $100,000 in the event of a bank failure, not investment losses.

Defendant's Initials           32          Chief Approval

**(b)**   **Insurance by Lloyd's of London and AIG Insurance**

In addition to FDIC insurance, PEARLMAN and others advised investors in the EISA program in oral representations, in marketing materials, and in some of the quarterly statements that were sent by United States Mail to investors, that their investments were "insured."

At first, PEARLMAN and conspirators represented that this insurance was through a policy with Lloyd's of London.  Towards that end, PEARLMAN provided sales agents and investors with a copy of a document that purported to be a Lloyd's of London insurance policy to serve as proof that Lloyd's of London insured the EISA accounts.  That document had a policy number for Lloyd's of London of 823/AM9100780, with the "Assured" being identified as Trans Con Airlines.  Lloyd's of London has confirmed that no such policy ever existed and that it never insured investments made in the Trans Con Airlines EISA program.  In fact, Lloyd's of London advised PEARLMAN of that fact in March 1999.  In response, PEARLMAN sent a letter to Lloyd's of London on March 30, 1999 acknowledging that "our company has no policies issued by you with regard to" the EISA program.

After Lloyd's of London confronted PEARLMAN about the false representation that EISA investments were insured by Lloyd's of London, PEARLMAN and other conspirators began to represent to investors in the EISA program that AIG Insurance insured the investments.  As was done with respect to the claimed coverage by Lloyd's of London, PEARLMAN had a document that he represented was the insurance policy that had been issued by AIG Insurance.  PEARLMAN, however, would not provide investors with a copy of that policy, but would only show it them.

Defendant's Initials _____     33     Chief Approval _____

AIG Insurance has confirmed that no such policy ever existed for the Trans Con Airlines EISA program.  In addition, forensics conducted on the computer system at the Trans Continental Companies revealed a document entitled "AIG.doc" on the directory belonging to the conspirator at the Trans Continental Companies who prepared it on or about April 7, 1999.  That "AIG.doc" is the electronic version of the document that was shown to investors.

### (c)    Individually Numbered Accounts

As noted above, PEARLMAN and others acting on his behalf and with his authorization have promoted the safety of investments in the EISA program by claiming, among other things, that the money is kept in "CD's" or in "individually numbered" accounts.  Based upon investigation conducted to date, that is not true.  To the contrary, PEARLMAN and his conspirators transferred the money between accounts and used it as they saw fit to pay personal expenses and to pay expenses related to the execution of the scheme or unrelated business operations.

An analysis of Trans Con Airlines bank records indicates that between January 2003 until December 2006, approximately $118 million of EISA investor funds were collected and deposited into bank accounts belonging to Trans Con Airlines.  Rather than going into "CD's" or "individually numbered" accounts, this analysis establishes that these funds were used to pay earlier investors in the EISA program and to PEARLMAN, several of his entities, and others involved in the EISA investment program.  Of the $118 million that was received during the time period from January 2003 through December 2006, approximately $43 million was paid out to EISA program investors as account closures or interest payments.  Another approximately $7 million was paid to

Defendant's Initials _____    34    Chief Approval _____

EISA sales agents.  Over $45 million was paid to PEARLMAN and several of his entities (which are identified below), as follows:

| PEARLMAN | $ 4,200,000 |
|---|---|
| Pearlman Enterprises | $ 34,000,000 |
| Trans Con Records | $ 2,000,000 |
| TC Leasing | $ 950,000 |
| Trans Con Talent | $ 1,700,000 |
| Fashion Rock | $ 710,000 |
| Trans Con Travel | $ 700,000 |
| F.F. Station | $ 350,000 |
| Trans Country Music | $ 228,000 |
| Trans Con Studios | $ 218,000 |
| Trans Con Aviation | $ 135,000. |

As PEARLMAN knew, there was never a point during the execution of the Ponzi scheme that any effort was made to keep EISA investments in segregated accounts or to hold them in an account for the purpose of accruing interest.

**(d)    Misrepresentations to Governmental Entities**

At various points in time, governmental entities asked PEARLMAN and his conspirators about the EISA program in an attempt to provide some oversight and to respond to consumer complaints.  Rather than respond truthfully, PEARLMAN and conspirators engaged in a pattern of efforts to thwart government investigations and oversight into the EISA program.  For example, several sales agents were approached by the State of Florida over various points in time and asked whether they sold EISA

Defendant's Initials _____        35        Chief Approval _____

investments and how much they received for their participation in such a sales effort. Almost without fail, the sales agents lied to the State of Florida and claimed that they either were not involved in marketing or selling EISA investments any longer or, if they had referred customers to it, that they did not make any money on those referrals.

By the end of 2006 when the Ponzi scheme was falling apart, PEARLMAN lied to the OFR about the number of EISA investors that there were and provided false documents to support that claim. It was in connection with those misrepresentations that PEARLMAN caused a false document to be provided to the OFR that represented that there was $39.5 million at German Savings Bank to cover outstanding EISA investments. As noted above, that representation was not true.

### (3)   Additional Misrepresentations Regarding Bank Fraud Scheme

PEARLMAN's misrepresentations in his bank fraud scheme were not limited to his use of "Cohen & Siegel" and German Savings Bank. The following is a summary of some, but not all, of the other misrepresentations that were made:

#### (a)   Tax Returns

PEARLMAN filed personal tax returns for 2000 and 2001. He was selected for audit by the Internal Revenue Service and never filed tax returns for any year from 2002 to the present. Despite that fact, some of the documents that were routinely provided to federally insured financial institutions were personal tax returns for PEARLMAN. Those returns purported to be filed by PEARLMAN, and they overstated his income for those years. By way of comparison, PEARLMAN's 2001 tax returns (which were actually filed) had an income of <u>negative</u> $3 million. His 2002 through 2005 tax returns always

Defendant's Initials _____        36        Chief Approval _____

reflected income of over $10 million.  Those tax returns were identified as being prepared by "Stanley Kaplan."

False tax returns were also submitted to federally insured financial institutions for Trans Con Airlines.  Those returns also purported to be prepared by "Stanley Kaplan," and they purported to be signed by "Harry Milner" (who, in fact, was deceased at the time that most of the returns were purportedly signed by him).

Federally insured financial institutions were provided with these false personal tax returns of PEARLMAN.  Interviews of representatives of those bank representatives confirm that those federally insured financial institutions relied on the representations contained in the false personal tax returns in their decisions to extend loans and lines of credit to PEARLMAN and various of his entities.

### (b)    TW Trust

PEARLMAN represented to federally insured financial institutions that he had $50 million in a trust with a "Bahamian" citizen by the name of Theodore Wullenkemper. PEARLMAN called the trust the "TW Trust" in some documents.  In fact, Wullenkemper is a real person.  He owns a blimp company in Germany and has a business and personal relationship with PEARLMAN.  In the early 2000's, Wullenkemper sued PEARLMAN on a contract.  A representative of Wullenkemper has confirmed that there is no $50 million "TW Trust" and that there never was.  Wullenkemper had no role in Trans Con Airlines or its business operations.

Defendant's Initials  _____          37          Chief Approval _____

E.    **Other Information About the Ponzi Scheme**

PEARLMAN was hardly alone in the execution of the Ponzi scheme.  To the
contrary, other conspirators performed key roles in making that scheme succeed for as
long as it did.  PEARLMAN's conspirators, among other things, prepared false
documents to be provided to prospective investors; they lied to investors about how the
EISA program actually worked; they engaged in a cover-up to keep governmental
entities from learning the truth about the EISA program; they failed to disclose relevant
facts to investors after they had learned them; they lied to investors about when they
could receive their money back; and they conducted financial transactions, for their own
benefit and the benefit of others, that involved the proceeds that were obtained from the
scheme.

The execution of this conspiracy involved numerous mailings and wires.
Quarterly statements for the sale of stock and the EISA program were sent from Orange
County in the Middle District of Florida by United States Mail to each investor.  Money
received from the scheme was sent by wire transfers that originated from Orange
County in the Middle District of Florida.  Telephone calls were made to, and received
from, investors in the stock and EISA programs by use of interstate wires.  All of these
mailings and wires, and many others, were done in furtherance of the mail and wire
fraud scheme that were executed by PEARLMAN and others.

These schemes were successful in raising over $200 million from well over 1,000
individuals.  The parties acknowledge that for purposes of calculating the sentencing
guidelines range in this case the total amount of actual and intended loss in this case is
over $200 million, that there are more than 250 victims who suffered a pecuniary loss as

Defendant's Initials _____          38          Chief Approval _____

a result of PEARLMAN's actions (as is required for purposes of applying U.S.S.G. § 2B1.1(b)(2)(C)), and that PEARLMAN was the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (as is required for purposes of applying U.S.S.G. § 3B1.1(a)).

**F.**   **Other Information About the Bank Fraud Scheme**

At all times relevant to this case, Integra Bank N.A. ("Integra Bank"), Bank of America, American Bank of St. Paul ("American Bank"), First International Bank & Trust ("FIBT"), MB Financial Bank NA ("MB Financial"), Northside Community Bank ("Northside"), Mercantile, Washington Mutual, First National Bank & Trust ("FNBT"), and HSBC Bank were financial institutions, the accounts and deposits of which were federally insured by the FDIC.

As with the Ponzi scheme, PEARLMAN was hardly alone in the execution of the bank fraud scheme.  To the contrary, PEARLMAN's conspirators, among other things, prepared the false tax returns and audited financial statements of Trans Con Airlines and PEARLMAN that were provided to federally insured financial institutions; they prepared false documents about Cohen & Siegel and assisted in the preparation of documents that purported to be from that accounting firm; they undertook efforts to make Cohen & Siegel and German Savings Bank appear to be legitimate entities; they falsely represented to federally insured financial institutions PEARLMAN's financial situation and the purpose of sought-after financing; they failed to disclose to other federally insured financial institutions material facts about PEARLMAN's financial situation; and they disseminated information about the financial status of PEARLMAN and Trans Con Airlines that they knew to be false.  The execution of this conspiracy

Defendant's Initials _____      39      Chief Approval _____

involved numerous mailings and wires, including mailings (including by Federal Express) and facsimiles of false tax returns, financial statements, and quarterly compliance certificates.

These schemes were successful in raising over $100 million from at least ten federally insured financial institutions, including the following loans:

| Date | Bank | Loan |
|------|------|------|
| 07/01 | Mercantile | $6 million loan to PEARLMAN |
| 10/02 | MB Financial | $5,029,485.89 loan for Planet Airways, Inc. ( guaranteed by PEARLMAN and Trans Continental Airlines), renewed 5/05 for $5,059,358.49 |
| 03/03 | Washington Mutual | $5 million line of credit to PEARLMAN |
| 05/03 | Mercantile | $6 million loan to PEARLMAN |
| 05/03 | Washington Mutual | $2 million increase to line of credit to PEARLMAN |
| 06/03 | Mercantile | $500,000 line of credit to Transcontinental Airlines (guaranteed by PEARLMAN) |
| 06/03 | Bank of America | $10 million loan to PEARLMAN, renewed 6/06 for $10 million |
| 11/03 | Bank of America | $4 million loan for PEARLMAN, renewed 11/04 for $3,997,187 |
| 11/03 | Bank of America | $2 million loan for PEARLMAN |
| 12/03 | Bank of America | $1.0 million loan to Baeza Jewelry dba Fashion Rock (guaranteed by PEARLMAN and another individual) |
| 02/04 | Mercantile | $6 million loan to PEARLMAN, renewed 9/26/05 |
| 02/04 | Bank of America | $1.5 million loan to Fashion Rock/Talent Rock (guaranteed by PEARLMAN), renewed 2/05 for $1.5 million |

Defendant's Initials                     40                    Chief Approval ⎯꧂꧂꧂

| 04/04 | Bank of America | $5.4 million loan for PEARLMAN (secured by PEARLMAN residence at 12488/12504 Park Ave, Windermere, FL) |
|---|---|---|
| 04/04 | Bank of America | $322,710 loan for PEARLMAN (secured by RR Phantom) |
| 05/04 | Bank of America | $750,000 loan to Pearlman, renewed on 5/12/05 for $750,000 and renewed on 7/14/05 for $1.5 million |
| 09/04 | Integra | $3 million Revolving Credit Facility Note for Trans Con Airlines and $16 million Term Note Loan for Trans Con Airlines |
| 12/04 | FIBT | $5.4 million loan for Transcontinental Jet Shares (secured by a Gulfstream II-SP Aircraft, Tail No. N365TC and guarantees from PEARLMAN and Trans Con Airlines) |
| 01/05 | Mercantile | $2 million loan to PEARLMAN |
| 02/05 | FIBT | $10 million loan for PEARLMAN (secured by PEARLMAN's residence at 12488 Park Avenue, Windermere, Florida, a pledge of 200,000 shares of preferred stock in Trans Con Airlines, and a guarantee by Trans Con Airlines) |
| 03/05 | Washington Mutual | $1,250,000 Increase to Line of Credit to PEARLMAN |
| 05/05 | Bank of America | $23.5 million and $3 million loans to FF Station |
| 05/05 | FIBT | $10 million loan for PEARLMAN (secured by stock in Trans Con Airlines) |
| 06/05 | FNB&T | $18.5 million loan to PEARLMAN |
| 06/05 | Bank of America | $4 million loan to PEARLMAN |
| 03/06 | American Bank | $28.5 million loan for PEARLMAN, Trans Con Records, and Top of the Pops |
| 08/06 | HSBC | $2 million line of credit for PEARLMAN |
| 08/06 | Integra | $400,000 Promissory Note for PEARLMAN |
| 09/06 | Integra | $552,380.96 Promissory Note for PEARLMAN |
| 09/06 | Northside | $2.5 million loan for Trans Con Studios and PEARLMAN (guaranteed by Trans Con Airlines) |
| 12/06 | HSBC | $5.5 million loan to Trans Continental Television |

Defendant's Initials           41          Chief Approval  _RBM_

| 01/07 | HSBC | $30 million revolving line of credit to F.F. Station, LLC (approved by HSBC but not funded) |

Each of these loans and lines of credit were either executed in, or involved the submission of false documents or false representations from, Orange County in the Middle District of Florida.

The parties acknowledge that for purposes of calculating the sentencing guidelines range in this case the total amount of actual and intended loss in this case for the bank fraud scheme is over $100 million and that PEARLMAN was the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (as is required for purposes of applying U.S.S.G. § 3B1.1(a)).

**G.     Money Laundering**

As part of the execution of the Ponzi scheme and bank fraud scheme, PEARLMAN laundered millions of dollars through financial transactions.  Some transactions were done to re-invest fraudulently obtained proceeds back into the schemes.  Others were done to convert fraudulently obtained proceeds into other assets or to disguise from where they had come.

When it became clear that the Ponzi scheme and bank fraud scheme were falling apart, PEARLMAN undertook efforts to hide assets from governmental entities and potential creditors and to send them out of their reach.  The following is one such example.

On October 27, 2006, PEARLMAN opened checking account number ********8671 at Bank of America, in the name of Trans Continental Enterprises, LLC.

Defendant's Initials _____          42          Chief Approval _____

PEARLMAN was the signer on the account.  The address on the account was 12488

Park Avenue, Windermere, FL 34786, which was PEARLMAN's home address.   From

October 27, 2006 through December 31, 2006, approximately $3,833,000.00 of EISA

investor money was deposited into this account number.  Because this money was

obtained as a result of the misrepresentations that had been made in connection with

the EISA program, PEARLMAN knew that he was not entitled to these proceeds and

that they had been derived from illegal activities (i.e. mail fraud and wire fraud).

PEARLMAN opened this account, because he knew that the EISA program was

about to be shut down.  In fact, PEARLMAN deliberately opened this account under a

different name than previous EISA accounts to elude investigators of its existence.

PEARLMAN and his conspirators continued to collect EISA funds and directed those

funds to be deposited into this account rather than previous EISA accounts known by

investigators.

A handwritten note, on Louis J. Pearlman letterhead, in PEARLMAN's

handwriting dated November 3, 2006, to Bank of America, requested the following:

"Please transfer from our Trans Continental Enterprises Account #003446278671

$500,000 to Global Investments and Services Ltd. Industriestraat 16, 5107 NC Dongen,

The Netherlands.  Bank: Ing Bank; Account # 661434230; IBAN

NL68INGB0661434230; BIC: INGBNL2A; Bank Address: ING Bank Spoorlaan 420,

Tilburg, The Netherlands."  This request was signed, "Lou Pearlman."

In response to this request, Bank of America made a wire transfer debit of

$500,000, dated November 11, 2006, from  account number ********8671 to Global

Investments Services at ING Bank in the Netherlands.   Those funds consisted of

Defendant's Initials _____          43               Chief Approval _____

criminally derived proceeds from mail and wire fraud.  The $500,000 wire transfer

involved a transfer affecting interstate and foreign commerce between two financial

institutions the activities of which affect interstate and foreign commerce.  This

transaction originated from the Middle District of Florida.

H.     **Bankruptcy Fraud**

PEARLMAN's participation in fraud did not end after the Ponzi and bank fraud

schemes had fallen apart.  PEARLMAN left the United States in January 2007 after it

had become apparent that his bank loans were in default and there was not enough

money to re-pay most of the EISA investors.  On February 20, 2007, one of the entities

affiliated with PEARLMAN, F.F. Station LLC, entered into voluntary bankruptcy, case

number 06:07-bk-575-ABB, filed in the Middle District of Florida.  On March 1, 2007,

PEARLMAN was forced into personal bankruptcy, case number 06:07-bk-00761-ABB,

filed in the Middle District of Florida.  As shown by the e-mail accounts that PEARLMAN

used while he was outside the United States, PEARLMAN was aware of these

bankruptcy filings, and he kept up-to-date on what happened in the bankruptcies.

On or about March 6, 2007, PEARLMAN caused a false claim to be filed in the

F.F. Station, LLC bankruptcy proceeding, case number 6:07-bk-00575-ABB.  The claim

was made by German Savings Bank and a "Mr. L.A. van Balen" in the amount of

$5,200,853.  The claim represented that German Savings Bank had loaned F.F. Station,

LLC, $5.0 million on June 1, 2005 and that it had not been repaid.  PEARLMAN knew

(and an analysis of bank records for F.F Station, LLC confirm) that no such loan had

ever been made and that no monies were due German Savings Bank by F.F. Station,

LLC.  Instead, this effort was nothing more than an attempt to fraudulently divert assets

Defendant's Initials _____                    44                    Chief Approval _____

of the bankruptcy estate by filing a false claim with the Bankruptcy Court.          In addition, PEARLMAN arranged for the sale of a 25 percent interest that one of his entities, Louis J. Pearlman Enterprises LLC, had in Transcon Mobile, LLC.  The deal was reached on March 21, 2007, and the amount to be paid by a third party for that 25 percent interest was $750,000.

On April 18, 2007, the receiver that had been appointed by the state court for several of PEARLMAN's entities was notified that a partial payment for the sale of Louis J. Pearlman, LLC's 25 percent interest in Trans Con Mobile was in transit.  The amount of the payment was $250,000, and the funds were being wired to Germany.

On April 18, 2007, the receiver placed Louis J. Pearlman Enterprises, Inc. into bankruptcy, case number 06:07-bk-1505-ABB, Middle District of Florida.  On April 19, 2007, the Bankruptcy Judge issued an injunction freezing the transfer of the $250,000 pending examination by the Bankruptcy Court.  On May 3, 2007, the receiver placed Louis J. Pearlman Enterprises, LLC into bankruptcy, case number 6:07-bk-1779-ABB, Middle District of Florida.

After he became aware of the freezing of the $250,000 in funds on April 19, 2007, PEARLMAN took steps to attempt to get that money.  Most significantly, PEARLMAN and others caused false filings to be made in the Bankruptcy Court for the purpose of attempting to divert assets of the bankruptcy estate.  These claims falsely represented that PEARLMAN had transferred his 100 percent ownership interest in Louis J. Pearlman Enterprises, LLC, to German Savings Bank on August 9, 2006 in repayment of a loan made by German Savings Bank to PEARLMAN in March 2005.  No such loan ever existed. PEARLMAN, while outside of the United States, provided others

Defendant's Initials _____          45          Chief Approval _____

via international e-mail with backdated and falsely notarized documents that purported to establish that he had 100 percent ownership in Louis J. Pearlman Enterprises, LLC and that he had transferred that ownership interest transfer to German Savings Bank on August 9, 2006.  The individuals who received those false documents then arranged to have the false content of those documents presented in Bankruptcy Court in an attempt to divert assets of the bankruptcy estate in a fraudulent matter.  Those false claims were submitted in Bankruptcy Court in the Middle District of Florida on April 19, 2007.

10.    <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials           46          Chief Approval _____

11.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___26th___ day of ___February___, 2008.

ROBERT E. O'NEILL
United States Attorney

_____          By: _____
LOUIS J. PEARLMAN                      Roger B. Handberg
Defendant                              Assistant United States Attorney


_____          _____
R. Fletcher Peacock                    Daniel W. Eckhart
Attorney for Defendant                 Assistant United States Attorney


_____          _____
Donald R. West                         Carolyn J. Adams
Attorney for Defendant                 First Assistant United States Attorney


_____
Stephen J. Langs
Attorney for Defendant


Defendant's Initials _____          47          Chief Approval _____